UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILLIAM COLEMAN,                          :

       Plaintiff,                          :

       vs.                                :      No. 3:11cv1632(WIG)

EDWARD A. BLANCHETTE, M.D., and   :
SUZANNE E. DUCATE, M.D.,

                                        :

       Defendants.
-----------------------------------------------------X

RULING ON DEFENDANTS' MOTION TO DISMISS [Doc. # 20]

Following affirmance of his conviction for sexual assault in a spousal relationship, *State v. William C.*, 103 Conn. App. 508, *cert. denied*, 284 Conn. 928 (2007), Plaintiff, William Coleman,[1] who is serving a 15-year sentence at the McDougall-Walker correctional institution, began a hunger strike, protesting the perceived injustices in the state's judicial system. When his physical condition had deteriorated significantly, former Commissioner of Correction Theresa Lantz obtained from the state court a temporary injunction, *Lantz v. Coleman*, 51 Conn. Supp. 99 (Conn. Super. Ct. May 21, 2009), and then, after a five-day trial, a permanent injunction allowing prison officials to force-feed Coleman to prevent life-threatening dehydration and starvation. *Lantz v. Coleman*, No. HHDCV084034912, 2010 WL 1494985 (Conn. Super. Ct. Mar. 9, 2010). Coleman then filed the instant civil rights action under 42 U.S.C. § 1983 against

---

[1] Because of Coleman's status as a defendant in the criminal case and state-court action, a petitioner in his state-court habeas action, and a plaintiff in this case, to avoid confusion the Court will refer to him as "Coleman" throughout this Ruling. The Court has used the term "Defendants" to refer to the two defendants in this action, Blanchette and Ducate. The Court has used the term "Commissioner" to refer to former DOC Commissioner Lantz, who was the plaintiff in the state-court action.

Defendants, Edward Blanchette, M.D., an internist and clinical director of the medical department at the prison, and Suzanne Ducate, M.D., the director of psychiatry at the prison, claiming that his rights under the Eighth and Fourteenth Amendments to the U. S. Constitution, under Article 1, Section 1 of the United Nations Convention Against Torture, and under the due process provisions of Connecticut's Constitution, were violated by Defendants' forcibly restraining and feeding him (Pl.'s Compl. ¶¶ 12-14).

In February 2012, Defendants filed a motion to dismiss this action for lack of subject-matter jurisdiction based upon the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971), *see* Rule 12(b)(1) & Rule 12(h)(3), Fed. R. Civ. P., and for failure to state a claim upon which relief may be granted based upon their qualified immunity.  *See* Rule 12(b)(6), Fed. R. Civ. P. On March 13, 2012, the Connecticut Supreme Court handed down its decision in Coleman's appeal of the state court action, *Comm'r of Corr. v. Coleman*, 303 Conn. 800 (2012), unanimously affirming the trial judge's ruling.  This decision rendered moot the issue of abstention originally raised by Defendants.  Accordingly, Defendants filed a supplemental brief asserting that Coleman's federal suit is barred by the doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion), as well as their qualified immunity.

Additionally, on December 30, 2010, Coleman filed a petition for a writ of habeas corpus in state court, challenging the conditions of his confinement as "abusive" and constituting "torture," in violation of international law, the U.S. Constitution, and the Connecticut Constitution.  *Coleman v. Comm'r of Corr.*, 137 Conn. App. 51, 55 (2012). The habeas court summarily dismissed his petition on March 1, 2011.  The Appellate Court of Connecticut granted certification to appeal and, on July 24, 2012, affirmed the dismissal of his habeas petition.  *Id.*

2

<u>Background</u>

The Connecticut Supreme Court's opinion sets forth the factual and procedural aspects of

the case relevant to this motion:

> [Coleman] is currently serving a fifteen year sentence, execution suspended after eight years, with a maximum discharge date of December 30, 2012, at the McDougall-Walker correctional institution following his convictions on charges pertaining to his relationship with his ex-wife. On September 17, 2007, approximately two weeks after the Appellate Court issued its decision affirming his convictions, [Coleman] began a hunger strike. At that time, he weighed approximately 237 pounds. On January 9, 2008, by which time [Coleman's] weight had dropped to 162 pounds, the commissioner sought both a temporary and a permanent injunction authorizing the department to restrain and force-feed [Coleman] if it became medically necessary given the health risks associated with hunger strikes. In response, [Coleman] asserted several special defenses, including the common law, constitutional, and international law grounds…. On January 23, 2008, the trial court granted the temporary injunction,[2] with a trial set to follow on the permanent injunction.

> Following a trial to the court,[3] the trial court granted the commissioner's application for a permanent injunction.[4] In its memorandum of decision, the trial court found the following facts. "[Coleman] has been determined to be mentally competent every time he has been evaluated during his incarceration. [He] has never been diagnosed as suicidal. He is presently engaged in a protest, taking the form of a hunger strike… protesting what he claims to be a broken family and criminal judicial system that led to his wrongful conviction. [Coleman] maintains that he is innocent of the crimes of which he is convicted. [He] also insists that his conviction is a form of ongoing abuse to his two sons…with whom he has had no contact since his conviction in 2005, and who are in the sole custody of his ex-wife. Through his protest, [Coleman] wants to raise awareness of what he perceives to be the misuse and abuse of the criminal and family judicial system; in particular, the assertion of false criminal allegations in the context of divorce proceedings.

---

[2]   *See Lantz v. Coleman*, 51 Conn. Supp. 99 (Conn. Super. Ct. 2009).

[3]   The trial lasted five days, at which Coleman, Blanchette, Ducate, and DOC Commissioner Brian Murphy, among others, testified.

[4]   *See Lantz v. Coleman*, No. HHDCV084034912, 2010 WL 1494985 (Conn. Super. Ct. Mar. 9, 2010).

"[Coleman] clearly knows about the dangers of organ failure and death that could result from the refusal of nutrition, having had many discussions about such problems with [the department's] health staff and having heard the testimony at the temporary injunction hearing. [Coleman] insists that the termination of his protest does not depend on receiving anything from the [department], or the outcome of his habeas corpus proceedings or the outcome of this case.  He is clearly willing to continue this protest with no goal, other than the vague one of publicizing his perception of defects in the justice system."

The trial court also noted the following events that had ensued subsequent to its order granting the temporary injunction. Throughout the course of his hunger strike, [Coleman's] voluntary ingestion of nutrients and liquids has varied: at some points, [Coleman] has voluntarily consumed ice chips, milk, orange juice, coffee and tea, or a liquid nutritional supplement; at other points, he has refused to ingest food or liquids in any form. Approximately one year after his hunger strike began, [Coleman] stated that the strike "need[ed] to be cranked up again," at which point he ceased all oral intake, including fluids. As a result of increasing signs of dehydration, on September 22, 2008, when [Coleman's] weight was just 139 pounds, Edward Blanchette, a physician and the clinical director of the department, determined that forced intravenous hydration was necessary to prevent death or irreversible harm.

"On October 16, 2008, [Coleman] said 'I lost another [eight] pounds. I didn't think I would be going much longer,' and 'I don't want to go to church but I'd like to see a priest.' Beginning that day, [Coleman] showed low values of potassium, which is an important electrolyte to regulate certain bodily processes, putting [Coleman] at risk for heart irritability and cardiac [arrhythmias]. [Coleman] weighed 129 pounds on October 17, 2008. On October 23, 2008, Blanchette determined that [Coleman] was at an ever increasing risk of sudden death or irreversible complications because of his hunger strike. Blanchette determined that it was necessary to place a nasogastric . . . tube through which liquid nutritional supplement would be given unless [Coleman] would agree to voluntarily accept at least some liquid nourishment. [Coleman] declined, so a [nasogastric] tube was placed for the first time on October 23, 2008.

"[Coleman] had been told on a number of occasions that if he was to be force-fed, it would be through a [nasogastric] tube, which would be inserted through his nose and threaded down into his stomach. This is the simplest, safest method and the preferred procedure to provide artificial nutrition. The [nasogastric] tube utilizes the gastrointestinal system, and, in general, has fewer risks of complication than any other artificial nutrition method. Placing [a nasogastric] tube does not usually cause pain and is normally well tolerated.

"[Suzanne] Ducate [a physician and director of psychiatric services of the department] has never had any patient experience . . . great pain with the

4

placement of a [nasogastric] tube. That includes patients of smaller stature than [Coleman], as well as persons receiving a larger diameter [nasogastric] tube. The placement of a [nasogastric] tube is neither a difficult nor a risky procedure; doctors are trained in the placement of such tubes in their first year as medical students by practicing on each other. Serious complications from the placement of a [nasogastric] tube are rare.

"On October 27, 2008, a second [nasogastric] feeding was done. [Coleman] claims he suffered excruciating pain on each occasion. He refused to sip water, however, to facilitate the insertion of the tube into his large nasal cavities and down his throat. On each occasion, he twisted during the procedure and the [nasogastric] tube kinked on the first attempt but was successfully placed on the second attempt. Contrary to his assertion, he did not vomit. There was no perforation of his mucosa. A liquid nutritional supplement was inserted directly into [Coleman's] stomach via the [nasogastric] tube on each occasion.

"After the second feeding, [Coleman] resumed taking liquid nutritional supplements. . . . By December 1, 2008, he weighed 154 pounds. For the next two months, his weight was relatively stable. . . . Since the time he started taking nutritional supplements in late October of 2008, his health and appearance [had] improved markedly. But it is clear that [Coleman] may resume his fasting at any time and that, but for the [intravenous fluid] and [nasogastric] intervention, he would have died long before [the] trial [on the permanent injunction]. It is also clear that if the [department] lacked the legal means to force-feed him during his incarceration, he would starve to death before his sentence is completed.
…

On the basis of the foregoing facts, the trial court determined that the commissioner had met the burden of proof as to the application and that [Coleman] could not prevail on his special defenses. Accordingly, that court granted the commissioner's application for a permanent injunction. The trial court authorized the commissioner to treat [Coleman] by means of hospitalization, intravenous fluids and nourishment, nasogastric feeding, and any other health care measures medically necessary to preserve his life and health, by use of reasonable force if necessary. The court ordered the commissioner, however, to first inquire whether [Coleman] intends to physically resist and, until and unless he did so on any one occasion, not to restrain him for such procedures.

*Coleman*, 303 Conn. at 804-10 (quoting the Conn. Super. Ct.'s decision) (footnotes omitted).

## Legal Standard

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which

relief may be granted, the Court "must accept all factual allegations in the complaint as true, and

5

draw inferences from those allegations in the light most favorable to the plaintiff." *In re AIG Advisor Group Sec. Litig.*, 309 F. App'x 495, 497 (2d Cir. 2009). A motion to dismiss pursuant to Rule 12(b)(6) can be granted only when "it appears beyond a doubt" that the complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). In addition, the Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). Thus, on a motion to dismiss under Rule 12(b)(6), judicial notice may be taken of other judicial documents that might provide the basis for claim preclusion or issue preclusion. *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir.), *cert. denied*, 506 U.S. 821 (1992); *Can v. Goodrich Pump & Engine Control Sys., Inc.*, 711 F. Supp. 2d 241, 246 (D. Conn. 2010).

<u>Discussion</u>

1.  Res Judicata and Collateral Estoppel

Defendants argue that Coleman's federal civil rights complaint is barred by the doctrines of res judicata and collateral estoppel. As the Second Circuit held in *Conopco, Inc. v. Roll International*, 231 F.3d 82, 86-87 (2d Cir. 2000), "[d]ismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises claim preclusion . . . as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the

plaintiff's claims are barred as a matter of law." *See also Day*, 955 F.2d at 811 (claim barred by res judicata); *Burgess v. Hartford Life Ins. Co.*, No. 3:09-cv-888(CFD), 2010 WL 3490968, at *3 (D. Conn. Aug. 30, 2010) (holding that the action was subject to dismissal under Rule 12(b)(6) under the doctrine of collateral estoppel).

Traditionally, the doctrine of res judicata, or claim preclusion, provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). "Whether a claim that was not raised in the previous action could have been raised therein depends in part on whether the facts essential to support the second were present in the first." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) (internal citations and quotation marks omitted). Res judicata is distinguishable from the very similar but distinct doctrine of collateral estoppel, which is also known as issue preclusion. As defined in *Allen*, "[u]nder collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." 449 U.S. at 94. Thus, generally, "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment is barred, even if the issue recurs in the context of a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001).

The party asserting claim or issue preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment. *Can*, 711 F. Supp. 2d at 246 (citing *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir. 1997)). On the other hand, "the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with [ ] the party opposing the application of issue preclusion." *Id.* (quoting

*Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996)) (internal quotation marks omitted).

"Federal courts are compelled by the 'full faith and credit' statute to give the same collateral estoppel and res judicata effects to state court judgments as would the courts of that state." *Burgess,* 2010 WL 34490968, at *3 (internal citations and quotation marks omitted). Therefore, the effects of claim and issue preclusion on this action must be viewed under Connecticut state law. *See id.* The Connecticut courts have held that the doctrine of res judicata, or claim preclusion, provides that "[a] valid, final judgment rendered on the merits by a court of competent jurisdiction is an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the same claim or demand." *Gaynor v. Payne*, 261 Conn. 585, 595–96 (2002) (internal quotation marks omitted). "Collateral estoppel, or issue preclusion, prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." *Waterbury Equity Hotel, LLC v. City of Waterbury*, 85 Conn. App. 480, 493 (2004)(quotation marks and citations omitted), *cert. denied*, 272 Conn. 901 (2004); *see also Lyon v. Jones*, 291 Conn. 384, 406 (2009) ("[C]ollateral estoppel . . . is that aspect of res judicata that prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined.") (citations omitted).

The Connecticut Supreme Court has held that the doctrines of res judicata and collateral estoppel "are judicially created rules of reason that are enforced on public policy grounds; we

have observed that whether to apply either doctrine in any particular case should be made based upon a consideration of the doctrine's underlying policies, namely, the interests of the defendant and of the courts in bringing litigation to a close . . .  and the competing interest of the plaintiff in the vindication of a just claim. . . . These [underlying] purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." *Weiss v. Weiss*, 297 Conn. 446, 460 (2010) (internal citations and quotation marks omitted).  Both collateral estoppel and res judicata are grounded in "the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest."  *State v. Ellis*, 197 Conn. 436, 465 (1985), *on appeal after remand sub nom. State v. Paradise*, 213 Conn. 388 (1990), *overruled in part by State v. Skakel*, 276 Conn. 633, 693, *cert. denied*, 549 U.S. 1030 (2006). At the same time, the Connecticut Supreme Court has instructed that those doctrines of preclusion "should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies."  *In re Juvenile Appeal (83–DE)*, 190 Conn. 310, 318 (1983).

Here, there is no question that the prior state-court action involved an adjudication on the merits of the constitutional and international claims asserted herein and that Coleman was a party to both actions.  Coleman, however, argues that res judicata and collateral estoppel do not bar his claims in this suit because of the difference between the claims raised in the state court action and this federal civil rights lawsuit.  The state court litigation, he maintains, was initiated by the Commissioner seeking to determine whether the state could force-feed an inmate who is engaged in a hunger strike as a form of protest.  Conversely, in the instant lawsuit, Coleman is

the plaintiff who now seeks compensatory and punitive damages from Defendants for violations of his constitutional and international rights by virtue of the brutal and cruel manner in which Defendants carried out the administration of the force-feeding.

Had there not been a state-court trial following the force-feedings that are at issue in this case, Coleman's argument might bear weight.  Here, however, the sequence of events in the state court is critical.  The Commissioner first obtained a temporary order after a brief hearing in January 2008.  Blanchette then implemented the order with Coleman receiving multiple administrations of IV fluid and two involuntary nasogastric feedings in October 2008.  In 2009, the state court held a five-day trial, receiving copious amounts of evidence regarding not only the implications of permitting the Commissioner to use nasogastric tube feedings versus an inmate's right to refuse medical treatment, but also the manner in which these force-feedings had been carried out on Coleman.  During the trial, Coleman's attorney questioned Blanchette about the manner in which the force-feedings took place and the pain allegedly associated with the procedure.[5]  Coleman testified about the pain that he experienced with the procedure, and the deposition testimony of Coleman's medical expert medicals on the medical ethics of force-feedings was received into evidence.   Following the trial, the parties submitted post-trial memoranda, in which Coleman argued that Blanchette's force-feeding of him violated his Eighth Amendment rights and his rights under international law.[6]

---

[5]  The state-court trial transcripts have been provided as exhibits to Defendants' motion.

[6]  Additionally, Coleman's Post-Trial Brief, also an exhibit in this case, discusses at length the force-feedings that took place and the alleged violation of Coleman's civil rights, *see* Proposed Findings of Fact ¶¶ 42-91, 155-66; Concl. of Law at 44-50 (violation of international law), at 53-64 (violation of his First and Fourteenth Amendment rights), at 64-67 (violation of his rights under the Connecticut Constitution), and at 67-68 (violation of his Eighth Amendment right).

As part of its ruling on the Commissioner's request for a permanent injunction, the trial court considered and ruled upon, *inter alia*, Coleman's claims that prisoner force-feeding violates international law, *Coleman*, 2010 WL 1494985, at *16-20; that Defendants' actions in force-feeding Coleman violated his Eighth Amendment right, *id.* at *20; and that force-feeding violated his rights under the Fourteenth Amendment and the Connecticut Constitution, *id.* at *23-24.  On appeal, the Connecticut Supreme Court likewise exhaustively considered Coleman's claims that his force-feeding violated his rights under the Fourteenth Amendment and international law, *Coleman*, 303 Conn. at 104-12.  Coleman, however, did not pursue his Eighth Amendment claim on appeal, *id.* at 804, n. 3, and, thus, this claim was deemed to have been abandoned.

Coleman contends that, as the alleged cruel and inhumane conduct occurred *after* the Commissioner filed her initial complaint seeking an injunction in January 2008, his current federal civil rights case is fundamentally different than the previous state-court case.  In support, Coleman cites *Manbeck v. Micka*, 640 F. Supp. 2d 351, 364 (S.D.N.Y. 2009), for the proposition that "[c]laim preclusion 'does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit."  However, Coleman's reading of that holding does not do justice to the facts relevant to this case.   The Commissioner's state-court complaint sought a temporary and permanent injunction to force-feed Coleman.  Of course, this meant that at the time of the filing of the initial complaint, the Commissioner had not undertaken such a procedure.  Authorization was needed before the force-feeding could take place.  Despite the fact that the conduct had not yet occurred when the initial complaint was filed, the complaint anticipated that very conduct would take place, and it did.  Coleman had a full and fair opportunity to argue that his constitutional rights protected him from force-feeding.  He also had

11

a full and fair opportunity to assert the cruel and inhumane nature of the procedures that were implemented at the five-day trial, after the force-feedings had taken place and before the permanent injunction issued.  And, he had the opportunity to argue these claims in his appeal to the Connecticut Supreme Court.  Not only could Coleman have asserted these claims in the state-court action, but he did assert them, and they were decided.

Coleman also argues that "res judicata does not bar subsequent litigation when the court in the prior action could not have awarded the relief requested in the new action," citing *Marvel Characters, Inc.*, 310 F.3d at 287.  In *Marvel Characters*, the Second Circuit held that res judicata did not apply because the two lawsuits involved distinct claims, and the claims underlying the second suit did not exist at the time of the first suit, and therefore the first court could not have awarded relief on those claims.  *Id.*  Here, however, by the time of the trial on the permanent injunction, all of the facts underlying Coleman's civil rights claims did exist and the state court *could have* awarded relief.  As the Supreme Court held in *Baker*, 522 U.S. at 234-35, "We see no reason why the preclusive effects of an adjudication on the parties and those 'in privity' with them, *i.e.*, claim preclusion and issue preclusion (res judicata and collateral estoppel), should differ depending solely upon the type of relief sought in a civil action."  *Cf. Barber v. Barber*, 323 U.S. 77, 87 (1944) (Jackson, J., concurring) (Full Faith and Credit Clause and its implementing statute speak not of "judgments" but of "'judicial proceedings' without limitation"); 18 Charles A. Wright, Arthur A. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4467, p. 635 (1981) (Although "[a] second state need not directly enforce an injunction entered by another state . . .  [it] may often be required to honor the issue preclusion effects of the first judgment.").  Here, the issues and claims presented in this case were fully litigated in the state-court action and ruled upon.  The fact that they arose in the context of an

12

equitable proceeding for injunctive relief does not obviate the preclusive effect of the state court's adjudication on the merits.

The similarity between claims is evident in the state court's use of the "*Turner* test," *Turner v. Safley,* 482 U.S. 78, 89–91 (1987), which was the legal standard both parties agreed to use in analyzing Coleman's constitutional claims. *Coleman*, 303 Conn. at 844. Under the *Turner* test, the ultimate question is whether the prison action is "reasonably related to legitimate penological interests." *Coleman*, 303 Conn. at 831. The court must evaluate: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives. . . ." *Id.*  In applying the test, both the trial court and the Connecticut Supreme Court held that "the permanent injunction does not violate the defendant's constitutional rights." *Id.* at 844.

All of these issues relating to how the Commissioner "appropriately sought to preserve [Coleman's] life using the safest, simplest procedure available, rather than improperly seeking to punish [Coleman] for engaging in his hunger strike" were thoroughly vetted at trial.  *Id.*  The injunction was established by the trial court and subsequently affirmed on appeal by the Connecticut Supreme Court. *Coleman*, 303 Conn. at 844. The habeas court, and subsequently the Appellate Court of Connecticut, summarily dismissed his claims that the conditions to his confinement were "abusive" and constitute "torture." *Coleman*, 137 Conn. App. at 58.

Thus, because the state court has already adjudicated the same claims that Coleman attempts to rebrand as a civil rights action before this Court, this Court finds that the doctrines of

13

res judicata and collateral estoppel bar Coleman's claims in the instant lawsuit.   Accordingly,
the Court holds that Coleman's complaint fails to set forth a claim upon which relief may be
granted and should be dismissed under Rule 12(b)(6), Fed. R. Civ. P.

## 2.  Qualified Immunity

Defendants also contend that this action against them should be dismissed under Rule
12(b)(6), Fed. R. Civ. P., because they enjoy qualified immunity from suit because their actions
were taken only after a court order was obtained.  Coleman responds that, while the state court
authorized force-feeding, it did not authorize them to perform the force-feeding with
unnecessary brutality and cruelty, as alleged here.  Defendants reply that this issue was put to
rest after a five-day trial and after the Connecticut Supreme Court determined that the actions
they took on behalf of the Commissioner "appropriately sought to preserve [Coleman's] life
using the safest, simplest procedure available, rather than improperly seeking to *punish*
[Coleman] for engaging in his hunger strike."  303 Conn. at 844.

Dismissal under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which
relief may be granted based upon a government official's qualified immunity is appropriate if the
official's conduct, as described in the plaintiff's complaint, falls within one of three categories:
"(1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct
was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was
not clearly established at the time it occurred; or (3) if the defendant's action was objectively
legally reasonable in light of the legal rules that were clearly established at the time it was
taken."  *Bell v. Luna*, — F. Supp. 2d —, 2012 WL 696218, at *9 (D. Conn. Mar. 1, 2012)
(quoting *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002) (quotation marks,
citations, and alterations omitted)).   While the Court appreciates the arguments on both sides,

14

given that the Court has already determined that this action should be dismissed on grounds of res judicata and collateral estoppel, the Court declines to address the merits of the parties' qualified immunity argument.

Conclusion

It is clear that the most recent iteration of Coleman's complaints - this time a federal civil rights lawsuit - is merely an attempt to relitigate claims and issues previously decided by the Connecticut state courts.   This court is bound by statute, 28 U.S.C. § 1738, and the doctrines of res judicata and collateral estoppel to give full faith and credit to these rulings.  As in this case, where it is clear that the plaintiff's claims are barred as a matter of law, dismissal under Rule 12(b)(6) is appropriate.  Accordingly, Defendants' Motion to Dismiss [Doc. # 20] is GRANTED. The Clerk is directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED, this   4th   day of September, 2012, at Bridgeport, Connecticut,


        /s/ *William I. Garfinkel*
        WILLIAM I. GARFINKEL
        United States Magistrate Judge